**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3802-15T2

DEBORAH BURKE[1]
and ERIK KORNACKI,

    Plaintiffs-Respondents,

v.

FRANKE M. DONLON, III,[2]

    Defendant-Appellant,

and

ANNE D. MORRISON, ESQ.,
WEICHERT REALTORS and ITS AGENT
SERVANT, JENNIFER FONDONTS,

    Defendants.

_____

        Argued May 24, 2017 — Decided August 11, 2017

        Before Judges Simonelli, Gooden Brown and Farrington.

        On appeal from the Superior Court of New Jersey, Law Division, Morris County, Docket No. L-0707-14.

        Justin H. Scheier argued the cause for appellant.

_____

[1] Improperly pled as Debra Burke.
[2] Improperly pled as Frank Donalon, III.

John P. Dell'Italia argued the cause for respondents (Dell'Italia & Santola, attorneys; Mr. Dell'Italia, on the brief).

PER CURIAM

In this real estate matter, defendant Franke M. Donlon, III appeals from the February 25, 2016 Law Division order, which entered judgment in favor of plaintiffs Deborah Burke and Erik Kornacki following a bench trial. For the following reasons, we affirm in part, reverse in part, and remand for entry of an amended final judgment.

We derive the following facts from the record. On August 10, 2010, the parties executed a contract of sale regarding defendant's property in Randolph with an estimated closing date of October 15, 2010. The transaction was a short sale subject to the approval of defendant's two mortgage lenders, IndyMac Mortgage Services (IndyMac) and Green Tree. When the approvals were not obtained by October 13, 2010, the parties executed a use and occupancy agreement (U&O), and plaintiffs moved into the property on November 1, 2010.

The U&O required no rent payments from plaintiffs, but required them to pay for all utilities, lawn care, snow removal, maintenance, and repairs. Paragraph nine of the U&O provided:

> This [U&O] shall extend only to that date when Seller's lender accepts or rejects in writing Buyer's contractual offer to purchase. Should

Seller's lender reject Buyer's offer to purchase (or otherwise deny Seller's short sale application, or accept such application subject to conditions unacceptable to Seller including non-release[sic] of Seller by lender or any lienholder), Buyer shall have the option to (a) increase its offer to Lender's minimum price if applicable, (b) begin a three month occupancy agreement with Seller at $2,300 per month to enable Buyer the time to locate new housing, or (c) vacate the Premises within 7 days of receipt of written notice from Seller of such rejection, denial or imposition of conditions from Seller. In the event Buyer seeks to increase the purchase price under subsection (a), Buyer agrees to move quickly and diligently through a "negotiation" process (if any) with lender and in the event such process takes more than 15 days, Seller has the right to terminate the Contract and provide Buyer with 3 days'[sic] notice to vacate the Premises. On or before the initial occupancy date, Buyer shall deposit the sum of $2,300 as security to be held by Seller in Seller's attorney trust account until [c]losing at which time it will be credited to Buyer. If title does not close, Seller may use the deposit to cover loss incurred by Seller for Buyer's breach of this Agreement. In such event, the deposit (or balance thereof) shall be returned to Buyer within 30 days of the date Buyer vacates the Premises.

Paragraph ten of the U&O further provided:

Should closing of title not take place and the parties enter into a three-month [sic] occupancy agreement . . . and Buyer does not vacate the Premises on the appointed date therein, Seller may initiate legal action to remove Buyer from the Premises, Buyer shall be responsible for any and all legal and court fees incurred by Seller in bringing an

3

eviction or any action to enforce the terms of this [U&O].

Paragraph twelve of the U&O provided, "Buyer hereby waives its right to terminate the Contract of Sale as set forth in ¶10 of the Contract of Sale (See ADM Letter dated 9/8/10) . . . and SHM Letter dated 8/17/10)."[3]

The SHM letter contained the following amendment to paragraph ten:

> Closing shall be targeted to take place at the office of the Buyers' attorney on or about October 15, 2010. While the Buyers recognize that the within sale may be subject to the approval of Seller's lender, if closing does not take place within sixty days of the conclusion of attorney review, Buyers shall have the option to cancel the Contract. Sellers [sic] agree that if all conditions of sale have been met and he has vacated the premises, Buyers may be permitted to take occupancy prior to closing of title.

The ADM letter accepted the amendment as to paragraph ten with caveats:

> Acceptable, provided (a) Buyer's right to cancel the Contract is upon 15 days written notice and opportunity to cure; and (b) Buyer has the right to occupy the Property as long as Buyer waives any right to cancel Contract, Contract remains executory, and Buyer pays expenses from the date of occupancy.

---

[3] SHM appears to refer to an August 17, 2010 letter from plaintiffs' attorney, Sheila H. Mylan, Esq., and ADM appears to refer to a September 8, 2010 letter response from defendant's attorney, Anne D. Morrison, Esq.

A-3802-15T2

On September 27, 2010, defendant submitted a short sale application to the first lienholder, IndyMac. On October 23, 2010, the parties entered into the U&O.

Defendant did not submit a short sale application to the second lienholder, Green Tree, until May 6, 2013. On May 21, 2013, IndyMac informed defendant that the short sale request had been suspended and the file was no longer under review because Green Tree did not meet investor requirements.

The balance owed on the second mortgage was $73,375.74, but Green Tree agreed to accept $16,000 to be paid by August 31, 2013. On May 28, 2013, defendant asked plaintiffs to contribute $15,413 to secure Green Tree's approval, given that plaintiffs had occupied the property rent-free for two years. On May 31, 2013, plaintiffs declined to contribute, but advised they remained interested in purchasing the property. They further advised they would terminate the contract and vacate the property if defendant was unsuccessful in negotiating with the lenders to sell the property at the contract price. On June 28, 2013, Green Tree approved the application.

On June 27, 2013, plaintiffs terminated the contract and demanded return of their deposit. On July 11, 2013, defendant rejected the termination and advised he had received approval from Green Tree and expected approval from IndyMac. On July 15, 2013,

IndyMac issued an approval letter conditioned upon receipt of an acceptance by Green Tree. IndyMac's approval letter indicated that the first mortgage balance was $350,375.20, and IndyMac would pay Green Tree $6000.

On July 27, 2013, defendant's attorney sent a time of the essence letter to plaintiffs' new attorney setting August 9, 2013 as the closing date. The closing did not occur. Plaintiffs vacated the property in August 2013, and filed a complaint for the return of their deposit. On June 3, 2014, plaintiffs filed a third amended complaint, alleging breach of contract, breach of fiduciary duty, and negligence. On December 12, 2014, defendant counterclaimed for breach of contract and unjust enrichment. Defendant sought specific performance, rent for thirty-four months at $2,300 per month or $78,200, and money for alleged damage to the property.

Following a bench trial, Judge W. Hunt Dumont found no material breach of the contract because three years was an unreasonable amount of time for defendant to obtain short sale approval. In finding the time unreasonable, Judge Dumont noted defendant did not apply to Green Tree for approval for more than two years after the contract was executed. He noted that the contract provided "if title does not close, Seller may use the deposit [$2,300] to cover loss[es] incurred by Seller for Buyer's

breach of this Agreement." Judge Dumont reasoned that if plaintiffs had breached the contract, that provision essentially provided for liquidated damages.

Other than the provision that plaintiffs were not permitted to terminate the contract, Judge Dumont noted the contract was devoid of terms regarding the parties' rights if plaintiffs terminated. He concluded from that analysis that the only losses defendant could claim under the contract were equitable in nature for the time plaintiffs were in possession of the property. The judge found defendant had no contractual right to specific performance, and that specific performance would be too harsh under the circumstances. The judge found further that the U&O expressly provided that the parties were not in a landlord-tenant relationship, and there would be no charge for plaintiffs' use and occupancy of the property. Therefore, defendant had no reasonable expectation of obtaining rent which he sought in the amount of $78,200. In denying defendant equitable relief, the judge again pointed to the three years it took defendant to obtain the short sale approvals.

Finally, the judge denied plaintiffs' claims for $10,700 for lawn care, property damage, and other items the U&O required them to pay, and awarded them $27,179.50 of their $38,300 deposit. The judge awarded defendant the balance of $11,120.50. In doing so,

7                          A-3802-15T2

Judge Dumont denied defendant's request for $11,350 to replace a 24-foot Norwegian Spruce tree plaintiffs cut down after it was struck by lightning, instead awarding defendant $850 for tree removal costs.

Defendant filed a motion for reconsideration which was denied on April 15, 2016, for reasons set forth on the record. This appeal followed. On appeal, defendant argues that Judge Dumont erred by (1) rewriting the contract of sale and the U&O; (2) failing to order plaintiffs to pay for all the damages caused to the property; (3) basing his decision, in part, on "personal experience", not evidence; (4) failing to order specific performance requiring plaintiffs to purchase the property; and (5) failing to order plaintiffs to pay any rent or money for living at the property for free and thereby permitting plaintiffs to be unjustly enriched.

Our review of a trial court's fact-finding in a non-jury case is limited. Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011). "We 'do not disturb the factual findings and legal conclusions of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice[.]'" Llewelyn v. Shewchuk, 440 N.J. Super. 207, 213 (App. Div. 2015) (quoting Rova Farms Resort, Inc.

v. Investors Ins. Co. of Am., 65 N.J. 474, 484 (1974)). "However, we confer no deference to a trial court's interpretation of the law, which we review de novo to determine whether the judge correctly adhered to applicable legal standards." Id. at 214. "[F]or mixed questions of law and fact, [we] give deference . . . to the supported factual findings of the trial court, but review de novo the lower court's application of any legal rules to such factual findings." Sullivan v. Port Auth. of N.Y. & N.J., 449 N.J. Super. 276, 283 (App. Div. 2017) (citing State v. Pierre, 223 N.J. 560, 577 (2015)).

The objective in construing a contractual provision is to determine the intent of the parties. Mantilla v. NC Mall Assocs., 167 N.J. 262, 272 (2001) (citation omitted). The judicial task is simply interpretative; it is not to rewrite a contract for the parties better than or different from the one they wrote for themselves. See Zacarias v. Allstate Ins. Co., 168 N.J. 590, 595 (2001) (citation omitted). Thus, we should give contractual terms "their plain and ordinary meaning[,]" M.J. Paquet, Inc. v. N.J. DOT, 171 N.J. 378, 396 (2002) (citation omitted), unless specialized language is used peculiar to a particular trade, profession, or industry. See VRG Corp. v. GKN Realty Corp., 135 N.J. 539, 548 (1994) (citation omitted).

Defendant points to the U&O to support his argument that the terms of the U&O prohibited plaintiffs from terminating the contract to purchase the property. Defendant argues that once the U&O terms were negotiated and plaintiffs began residing in the property, they lost the ability to cancel the contract. Defendant repeats the well-known adage that "[c]ourts cannot make contracts for parties. They can only enforce the contracts which the parties themselves have made." Kampf v. Franklin Life Ins. Co., 33 N.J. 36, 43 (1960) (citation omitted). Plaintiffs argue the judge correctly found the delay in finalizing the sale was a reasonable basis on which to allow termination.

Judge Dumont wrestled with the failure of the parties to specify an end date for the closing of title, stating: "[t]he only contractual provision regarding a breach by buyer refusing to close states: 'if title does not close, Seller may use the deposit [$2,300] to cover loss incurred by Seller for Buyer's breach of this Agreement.'" Since the parties did not agree on a specific time, the law infers, as Judge Dumont found, the contract will be performed within a reasonable amount of time. River Dev. Corp. v. Liberty Corp., 45 N.J. Super. 445, 464 (Ch. Div. 1957), aff'd, 51 N.J. Super. 447 (App. Div. 1958), aff'd 29 N.J. 239 (1959). "What constitutes a reasonable time . . . 'is usually an implication of fact, and not of law, derivable from the language

used by the parties considered in the context of the subject matter and the attendant circumstances, in aid of the apparent intention.'"  Mazzeo v. Kartman, 234 N.J. Super. 223, 231 (App. Div. 1989) (citing West Caldwell v. Caldwell, 26 N.J. 9, 28 (1958)).  The "intent expressed or apparent in the writing" memorializing an agreement controls.  Friedman v. Tappan Dev. Corp., 22 N.J. 523, 531 (1956).

Terms are generally implied because:

> the parties must have intended them and have only failed to express them . . . because they are necessary to give business efficacy to the contract as written, or to give the contract the effect which the parties, as fair and reasonable [people], presumably would have agreed on if, having in mind the possibility of the situation which has arisen, they contracted expressly in reference thereto.
>
> [Mazzeo, supra, 234 N.J. Super. at 231 (quoting William Berland Realty Co. v. Hahne & Co., 26 N.J. Super. 477, 487 (Ch. Div. 1953), modified, 29 N.J. Super. 316 (App. Div. 1954)).]

An examination of the contract and the U&O reveal ample basis for the court to conclude that the parties did not intend either to languish for over two-and-a-half years.

All indications are that both sides anticipated the obstacles to closing would be resolved expeditiously.  The original contract of sale dated August 10, 2010 set the estimated closing date as October 15, 2010.  When it became apparent that defendant would

11

not receive short sale approval before that date, the parties signed the U&O on October 23, 2010. In paragraph nine, there is evidence that the parties anticipated lender approval within fifteen days, as the agreement stated: "Buyer agrees to move quickly and diligently through a "negotiation" process (if any) with lender and in the event such process takes more than 15 days, Seller has the right to terminate the Contract and provide Buyer with 3 days-notice to vacate the Premises." A further indication of early resolution is the parties' agreement to cover damages by a deposit of $2,300 or one-month's occupancy. Another indication that the parties anticipated that the U&O would be short in duration was the agreement that plaintiffs would pay no per diem charges to defendant for the occupancy.

We agree with Judge Dumont's finding of no material breach in plaintiffs' withdrawal of their offer to purchase, based upon his determination that the lapse of time between the execution of the U&O and defendant's application for short sale approval "over two years after the contract of sale was executed" was unreasonable under the circumstances. However, we continue our review.

The terms of the U&O expressly provide that if defendant's lenders accepted his short sale application subject to terms unacceptable to defendant, plaintiffs had the option to: (a) increase the offer; (b) begin a three-month occupancy at $2,300

12

per month; or (c) vacate within seven days.  The record reveals the option selection was triggered on May 21, 2013, when IndyMac advised defendant that the short sale request had been suspended and the file was no longer under review because the second lien did not meet investor requirements.  Notwithstanding, defendant's attorney wrote to plaintiffs on May 28, 2013, inquiring whether plaintiffs would pay $15,413 to Green Tree to secure sale approval.  On May 31, 2013, plaintiffs refused to contribute to the Green Tree demand and did not vacate within seven days.

Although defendant testified he was not sure of the exact date plaintiffs vacated the property, Kornacki testified that plaintiffs vacated the property in August 2013.  Thus, a three-month occupancy began in June 2013 and continued through August 2013.  Prior to trial, the parties stipulated that,

> [i]n the event [the court] rules [p]laintiffs were unjustly enriched and/or required to pay rent/money to [d]efendant for the time [p]laintiffs resided at the subject property, the rental amount shall be $2,300.00/month and [the court] shall determine how many months [p]laintiffs are required to pay rent for[.]

As determined by Judge Dumont, there is no basis for defendant's claim for rent beyond the three-month occupancy.  The U&O specifically and unambiguously provided that "Buyer agrees to pay Seller a use and occupancy charge of $0.00 per diem for occupancy of the Premises, or a total of $0.00, such sum to be

paid to Seller prior to Buyer's taking occupancy". Further, the U&O specifically eschews a landlord-tenant relationship, stating "[n]othing herein shall be construed to establish a landlord-tenant relationship between the parties as set forth in N.J.S.A. 2A:18-81.1 et seq." Finally, the U&O authorized eviction as defendant's only recourse if plaintiffs failed to vacate the premises in the event a closing did not take place, with plaintiffs to be responsible for costs and legal fees. Accordingly, consistent with the U&O, we remand for entry of an amended final judgment to award defendant $6900 for plaintiffs' occupancy of the premises for the months of June, July and August 2013.

Defendant argues further that specific performance should have been granted, because the non-cancellation provision was an integral part of the agreement, and the court erred in permitting plaintiffs to cancel the contract. Plaintiffs counter that specific performance -- as agreed by defendant's counsel -- would be a harsh consequence, and the court properly found it to be so.

In general, to establish the remedy of specific performance, a party must demonstrate that the contract in question is valid and enforceable at law. Marioni v. 94 Broadway, Inc., 374 N.J. Super. 588, 598 (App. Div. 2005), certif. denied, 183 N.J. 591 (2005). See 25 Williston, Contracts (Lord ed., 2002) § 67:2 at 186. Further, the party must show that "the terms of the contract

are expressed in such fashion that the court can determine, with reasonable certainty, the duties of each party and the conditions under which performance is due."  Salvatore v. Trace, 109 N.J. Super. 83, 90 (App. Div. 1969), aff'd o.b., 55 N.J. 362 (1970). Lastly, the party must demonstrate that an order compelling performance of the contract will "not be harsh or oppressive." Stehr v. Sawyer, 40 N.J. 352, 357 (1963); Ridge Chevrolet-Oldsmobile, Inc. v. Scarano, 238 N.J. Super. 149, 155 (App. Div. 1990).

The right to specific performance turns not only on whether a plaintiff has demonstrated a right to legal relief, but also whether the performance of the contract represents an equitable result.  Marioni, supra, 374 N.J. Super. at 599.  That is, after determining that the purchaser has a legal right to recovery, a court of equity must make a further determination that has been deemed to be discretionary.  See, e.g., Friendship Manor, Inc. v. Greiman, 244 N.J. Super. 104, 113 (App. Div. 1990) (specific performance is a discretionary remedy resting on equitable principles), certif. denied, 126 N.J. 321 (1991).

We are satisfied that Judge Dumont correctly exercised his discretion in denying specific performance, primarily because the equities in this case are far from clear.  The record is devoid of any substantive proof that the contingencies attached to the

short sale approvals were ever satisfied. As the judge noted, "no one can show me a letter in which [defendant] indicates that you've paid the money and therefore, you anticipate Green[]Tree will go through with approving." Without such a letter, or testimony upon which to base a finding, the court was unable to determine, with reasonable certainty, the duties of each party and the conditions under which performance was due. Given the lack of clarity regarding the terms under which performance was to be had, we find the judge's refusal to grant specific performance well within his discretion. The absence of expeditious performance on the part of defendant should not be rewarded with the admittedly harsh remedy of specific performance. Stehr, supra, 40 N.J. at 357.

Defendant argues Judge Dumont erred by allowing plaintiffs to terminate the contract based upon the delayed lender approval. In support of this argument, defendant highlights plaintiffs' failure to complain of the delay. Further, defendant asserts that the U&O did not permit plaintiffs to terminate due to an increase in price, and, even if it had, the price was never actually increased. Defendant relies on the absence in the record of any evidence regarding how long a short sale approval should take.

Defendant is correct that the U&O contained an explicit waiver of termination provision with a single exception, rejection of the purchase offer by the lenders. Because there is no proof that

16                                                    A-3802-15T2

defendant satisfied the contingencies of the short sale and obtained final approval to consummate the sale, we are satisfied that Judge Dumont's determination that the delay in closing combined with the absence of a contractual end date justified the finding that plaintiffs did not materially breach the contract.

Finally, we address defendant's claim that Judge Dumont erred in failing to require plaintiffs to pay replacement costs for the Norwegian Spruce which was damaged when it was struck by lightning. During the trial, the judge questioned defendant about the tree replacement quote. After ascertaining the quote for replacement of the tree was $13,054, the judge inquired, "are you seeking the plaintiff to pay for that? Even though it was hit by lightning?" Defendant responded that he had not known the tree had been hit by lightning prior to plaintiffs' testimony earlier in the day.

Subsequently, the judge ruled as follows:

> The court will allow [d]efendant to be reimbursed in full for each of those items, with the exception of restoration of the damaged tree, for that loss, the court will allow the cost of removing the tree ($850), but not the costs of acquiring a new 24-foot Norwegian Spruce ($11,350). That is excessive and unwarranted.

Although the U&O unequivocally stated that plaintiffs must indemnify defendant for any damages that occur during their occupancy of the property, the parties did not specify a formula

for calculating damages in the event of tree loss. "The predominant measure of damages in cases involving the destruction or removal of trees and ornamental shrubs is the diminution-of-market-value measure. Although various other measures have been applied by courts, the law is not rigid and "ordinarily the measure of damages is the resulting depreciation in the value of the land on which the trees or shrubs stood." Mosteller v. Naiman, 416 N.J. Super. 632, 639 (App. Div. 2010) (citing Kristine Cordier Karnezis, Annotation, Measure of Damages for Injury to or Destruction of Shade or Ornamental Tree or Shrub, 95 A.L.R. 3d 508 § 2 (2008)).

Cases addressing value ordinarily involve the tortious removal of trees. There is no evidence in the record that plaintiffs purposely caused the destruction of the tree. The record is devoid of any cause of damage to the tree other than plaintiffs' testimony that the tree was struck by lightning, causing part of it to fall on the house and requiring removal of the tree top. Presumably, the tree would have suffered the same damage regardless of who was in possession of the property. We find no abuse of discretion in the court's judge's award of $850 for removal of the remainder of the tree. In so finding, we note defendant presented no evidence of a peculiar value to the damaged

18

tree, nor loss in value of the property caused by the loss of the tree.

Affirmed in part, reversed in part, and remanded for entry of an amended final judgment consistent with this opinion.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION